UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MAFCOTE INDUSTRIES, INC., and                                                              PLAINTIFF
ROYAL CONSUMER PRODUCTS, LLC.,


v.                                                         CIVIL ACTION NO. 3:10-CV-00036-CRS-JDM


AVERITT EXPRESS, INC.,                                                                     DEFENDANT


## MEMORANDUM OPINION AND ORDER

### PROCEDURAL HISTORY

Mafcote Industries, Inc. and Royal Consumer Products, LLC. ("Plaintiffs") sued Averitt Express, Inc. ("Defendant") in state court for breach of contract related to the interstate transportation of Plaintiffs' goods. Defendant removed the case to this court (DN 1), and moved to dismiss the Complaint on the ground that the Carmack Amendment to the Interstate Commerce Act, 19 U.S.C. § 14706, preempted Plaintiffs' state law claim (DN 6). Plaintiffs then moved to dismiss the Complaint and requested permission to amend the Complaint (DN 8).

Plaintiffs' Amended Complaint seeks damages under the Carmack Amendment for Defendant's damage to Plaintiffs' goods and asserts claims for delay and consequential damages for the fees and penalties Plaintiffs' incurred through Defendant's noncompliant deliveries to Plaintiffs' customers (DN 16). Defendant asserted counterclaims for breach of contract, unjust enrichment, and declaratory judgment (DN 21) and filed a Motion for Summary Judgment against the Plaintiffs (DN 42).

**BACKGROUND**

Before the court is Defendant's Motion for Summary Judgment, in which the Defendant contends that a valid contract existed between the parties, which included the Defendant's tariff. In the alternative, the Defendant contends that the court should reform the contract to include Defendant's tariff, or that the "unclean hands doctrine" bars Plaintiffs' recovery (DN 42). If applicable, the Defendant's tariff would discharge Defendant's liability for "any loss of use, revenue, or profit or business opportunities or indirect, incidental, consequential, special, punitive or exemplary damages, even if [Defendant] is informed or is otherwise aware or should be aware of the possibility or likelihood of such damages." (DN 21).

In support of its Motion for Summary Judgment the Defendant alleges that Plaintiffs deceptively amended the transportation contract to exclude Defendant's tariff and then signed and returned the contract without alerting the Defendant to the amendment (DN 21, ¶ 13-14). Thus, the Defendant contends that Plaintiffs' amendment was not effective and that the Defendant's tariff is, or should be, included in the contract because the Defendant performed under the contract with the understanding that its tariff was applicable (DN 21).

Plaintiffs argue that during contract negotiations the Defendant knew the Plaintiffs were subject to their customers' penalties for Defendant's late or noncompliant deliveries (DN 45). Accordingly, Plaintiffs contend that they intended to exclude the Defendant's tariff from the contract and hold the Defendant liable for penalties and fees caused by the Defendant's late deliveries (DN 16). Plaintiffs allege (1) that the transportation contract excludes Defendant's tariff, and (2) that the Defendant is liable for the foreseeable consequential damages—the

penalties Plaintiffs' customers imposed against them for Defendant's delay, damage, and improper shipping documentation (DN 16, ¶¶ 7, 11, 18-19).

# I

Federal Rule of Civil Procedure 56(a) states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] A party moving for summary judgment bears the initial burden of specifying a basis for its motion by demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Not every factual dispute between the parties will prevent summary judgment, and the disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). After the moving party meets this burden, the nonmoving party bears the burden of showing "specific facts showing that there is a genuine issue for trial." *Id.* at 248 (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). Thus, the ultimate burden of demonstrating the existence of a genuine issue of material fact lies with the party opposing the motion. *See id.* at 247-48.

However, the evidence must be construed in the light most favorable to the party opposing the motion. *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting U.S. v. Diebold Inc.*, 369 U.S. 654, 655 (1962)). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson,* 477 U.S. at 255. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id*.

---

[1] Although both parties' cite Fed. R. Civ. P. 56(c) as the summary judgment standard, the Federal Rules of Civil Procedure as amended in 2010 identify the summary judgment standard in section 56(a). Fed. R. Civ. P. 56 advisory committee's note.

The Defendant requests summary judgment regarding three issues: (1) whether a valid contract, which included Defendant's tariff, existed between the parties; or (2) whether the court should reform the contract to include the Defendant's tariff, based on the theory that Plaintiffs' fraudulently altered the proposed contract to exclude the tariff, and (3) whether the "unclean hands doctrine" bars Plaintiffs from recovering damages from the Defendant (DN 42).

In response, the Plaintiffs argue (1) that their amendment to the contract made clear that they did not intend to include Defendant's tariff such that it would limit Defendant's liability for Plaintiffs' customers' penalties for the Defendant's nonconforming delivery (DN 45, 4); (2) that the Defendant accepted the exclusion of its tariff by performing under the contract (DN 45, 10-11); and (3) that the bills of lading ("BOL") that accompanied Defendant's deliveries, establish the Defendant's liability for consequential damages (DN 45, 9-10).

It is uncontested that in early 2009 the parties commenced negotiations for a transportation contract under which the Defendant would transport Plaintiffs' goods (DN 42). During negotiations two people were primarily responsible for the negotiations, T.J. Clayton for the Defendant and Sam Asher for the Plaintiffs (DN 42-2, 3). On March 12, 2009, after weeks of negotiation, Defendant's representative emailed the Plaintiffs a "proposed contract" stating, "for your review [] this is an effective proposal [,] if you guys are in agreement [] please have this signed off on and back over to me and we can get started." The Defendant attached the "Transportation Agreement" to the email which had been signed by the Defendant's Executive Vice President and Chief Operating Officer, Wayne Spain (DN 42-5, 4-5).

On April 8, 2009, almost one month later, Plaintiffs replied to the Defendant's proposed contract by emailing Defendant's representative T.J. Clayton, "[p]lease provide us with you [sic]

mailing address. We would like to send you the signed copies of the freight contract. Please confirm once you receive it so we can proceed with moving some of the freight to you." (DN 45). One day later, on April 9, 2009, Plaintiffs mailed a revised contract to the Defendant's legal department which was signed by Plaintiffs' President, Steve Schulman (DN 42-5, 4-5). Plaintiffs also enclosed a letter stating: "Enclosed please find three (3) copies of your Transportation Agreement which we have signed. Please countersign the agreements and return two (2) originals to us." (DN 42-5, 4-5). Although Plaintiffs amended the proposed contract in several places, the only contested amendment is a typewritten statement regarding Defendant's tariff where Plaintiffs added language stating that the tariffs "relate only to rates for freight classification and not to terms and conditions of service." (DN 44-2).

The Defendant alleges that Plaintiffs fraudulently altered the agreement to exclude the Defendant's tariff without notifying the Defendant (DN 42-5, 5). Plaintiffs counter-argue that their April 9, 2012 contract controls because they requested countersignatures (DN 45), which should indicate to the Defendant that Plaintiffs made changes to the terms of Defendant's proposed contract. Otherwise, Plaintiffs contend that they would have no need to request an additional signature as Defendant's Executive Vice President and Chief Executive Officer had already signed the proposed contract (*see* DN 42). Thus, Plaintiffs' argue that the Defendant was on notice that the Plaintiffs modified the contract (*see* DN 45).

As the nonmoving party, Plaintiffs must offer evidence demonstrating a genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 322. A "mere scintilla of evidence is insufficient" because there must be evidence on which a jury could find for the nonmoving party. *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000) (*quoting Anderson*, 477 U.S. at 252)). Plaintiffs

allege that evidence from the negotiation indicates that Plaintiffs did not intend to include Defendant's tariff in the contract (DN 45, 2). Plaintiffs' primary negotiator, Sam Asher, stressed Plaintiffs' concern about meeting their customers' requirements for timely shipments and conforming deliveries (DN 45-5). Asher stated that Plaintiffs had a "robust requirement for on-time shipments, [and] execution, and [that] nonconformities to those executions result in penalties [imposed against the Plaintiffs]." (DN 45-5).

Plaintiffs contend that Asher repeatedly expressed concern throughout the negotiation that Plaintiffs found it unacceptable for the Defendant's tariff to limit Plaintiffs' claims for damages for late or nonconforming deliveries. Asher stated he "discussed [the tariff] pretty hot and heavy a couple—at least a couple times because of the fact that [Plaintiffs] knew that the Staples account was such a challenge to us, and again, it was centered around that particular issue [of the tariff]." (DN 45-5, 32). Also, the Defendant knew before March 12, 2009, when the Defendant emailed the proposed agreement, that the Plaintiffs did not intend to incorporate the tariff. Defendant's primary negotiator, T.J. Clayton, stated early in negotiations that "[Plaintiffs] did not want the Averitt 100 to be applied and any rules tariff as it was related to the contract or the carriage, they did not want that to apply." (DN 45-4, 18-19).

There is no dispute that after the Plaintiffs submitted their contract with changed language that they followed-up with the Defendant by asking "were there any questions or any issues from the contract itself." (DN 45, 9). The Defendant did not respond, but later performed freight service for the Plaintiffs (DN 45). Based on these undisputed facts it is clear to the court that the original contract submission from the Defendant to the Plaintiffs constitutes an offer. S*ee* RESTATEMENT (SECOND) OF CONTRACTS § 24 OFFER DEFINED (1981). "An offer is the

manifestation of willingness to enter a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.*; *Klein v. Citizens Union Nat'l Bank*, 136 S.W.2d 770, 773 (Ky. 1940) (*citing* RESTATEMENT (FIRST) OF CONTRACTS § 32 REQUIREMENT OF CERTAINTY OF AN OFFER (1932)); *see* U.S. *v. Hardy*, 916 F. Supp. 1373, 1380 (W.D. Ky. 1995).

However, the Plaintiffs did not accept Defendant's offer. Rather, Plaintiffs made a counter-offer, which is "made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer." RESTATEMENT (SECOND) OF CONTRACTS § 39 COUNTER-OFFERS (1981); *Gen. Motors Corp. v. Herald*, 833 S.W.2d 804, 807 (Ky. 1992) (Leibson, J., dissenting) (noting that courts should apply counter-offer analysis instead of focusing on questions of fact regarding whether an offer is withdrawn or simply being considered). A counter-offer terminates an offeree's power of acceptance and effectively operates to reject the offer unless the offeror maintains a contrary intention. *Id*. A counter-offer must also be capable of being accepted. *Id*. Plaintiffs' counter-offer included all of the Defendant's original contract terms except with respect to eliminating the Defendant's tariff, and was also capable of being accepted because it was signed by Plaintiffs' president (*see* DN 45). Here, Plaintiffs' counter-offer operated as a rejection of the Defendant's offer. *See Gen. Motors Corp.*, 833 S.W.2d at 807.

The Defendant argues that Plaintiffs' counter-offer was deceptive or fraudulent (DN 21). Under Kentucky law, "[f]raud inducing a contract may be waived by affirmance that is equivalent to ratification of the contract by the party who claimed to have been deceived into entering into it." *Hampton v. Suter*, 330 S.W.2d 402, 406 (Ky. 1959). One way in which

ratification may be shown is when a party "accepted the benefits thereof or acted in a manner inconsistent with repudiation." *Id*.

The Defendant's argument is weakened because the changes in the Plaintiffs' counter-offer (1) were clear and obvious on the face of the contract; (2) were neither secretly located nor concealed in small typeface; (3) were mailed along with a letter requesting countersignature, which indicated that Plaintiffs' were making a counter-offer because the Defendant had already signed the proposed contract. If the Plaintiffs were simply accepting the Defendant's proposed signed offer, Plaintiffs' would have had no reason to request a countersignature. Moreover, (4) Plaintiffs sent three copies of their counter-offer, at the Defendant's request, to the Defendant's legal department—a department which is expected to have knowledge of contract formation (*see* DN 45).

Also, it is undisputed that the Defendant began transporting Plaintiffs' goods after Plaintiffs' submitted their signed counter-offer (*see* DNs 42-5, 5-6 and 45, 9). Plaintiffs contend that although they never received the countersigned contracts, it was Plaintiffs' experience that their customers and suppliers often received contract terms and confirmed assent by performance rather than by providing written confirmation (DN 45, 9 fn. 5). Therefore, the Defendant's argument regarding fraud fails because the undisputed facts indicate that the Plaintiffs' counter-offer was not fraudulent, and that the Defendant did not repudiate the terms of the counter-offer.

The question before the court is whether Plaintiffs' counter-offer was accepted. There is no evidence that the Defendant accepted in writing, but abundant evidence of acceptance by performance. "Acceptance by performance requires that at least part of what the offer requests be performed or tendered and includes acceptance by performance which operates as a return

promise." RESTATEMENT (SECOND) OF CONTRACTS § 50 ACCEPTANCE OF OFFER DEFINED; ACCEPTANCE BY PERFORMANCE; ACCEPTANCE BY PROMISE (1981); *Vermillion v. Marvel Merch. Co.*, 234 S.W.2d 673, 674 (Ky. 1950) (holding that beginning performance is "unequivocal acceptance of [a contract] in its entirety."). Beginning the "invited performance" is an acceptance by performance under RESTATEMENT (SECOND) OF CONTRACTS § 62 EFFECT OF PERFORMANCE BY OFFEREE WHERE OFFER INVITES EITHER PERFORMANCE OR PROMISE (1981). Although the offeror can "insist on any mode of acceptance . . . in case of doubt, an offer is interpreted as inviting the offeree to choose between acceptance by promise and acceptance by performance." *Id.* at cmt. a.

Moreover, Kentucky courts find a unilateral offer accepted by tendered performance. *Whitewood v. Robert Bosch Tool Corp.*, 3:04CV-631-H, 2006 WL 2873426 (W.D. Ky. Oct. 3, 2006), *aff'd*, 323 F. App'x 397 (6th Cir. 2009) (applying Kentucky law). "[A]n acceptance of an offer by part performance in accordance with the terms of the offer is sufficient to complete the contract." *Id.* It is "well settled that if the offer requests a return promise and the offeree . . . actually does or tenders what he was requested to promise to do, there is a contract if such performance is completed or tendered." *Allied Steel & Conveyors, Inc. v. Ford Motor Co.*, 277 F.2d 907, 911 (6th Cir. 1960), *construed in Whitewood,* 2006 WL 2873426. The Defendant cites no authority to oppose Plaintiffs' argument that their counter-offer excluded the Defendant's tariff to prevent it from limiting Plaintiffs' claims for damages from the Defendant (DN 45, 20-21).

In addition to the facts stated previously, Plaintiffs' claims against the Defendant for late or untimely delivery, broken pallets, and faulty paperwork, should have alerted the Defendant

that Plaintiffs intended to recover the penalties their customers' imposed against them for the Defendant's mistakes (*see* DN 45). It is also undisputed that the Defendant began transporting the Plaintiffs' goods after receiving Plaintiffs' counter-offer and that the Defendant continued transporting Plaintiffs' goods for almost six months, during which time Plaintiffs continued to submit claims for their customers' penalties to the Defendant (DN 21-4). Based on these facts, the Defendant accepted the Plaintiffs' counter-offer by performance. *See Whitewood,* 2006 WL 2873426; *see Allied Steel*, 277 F.2d at 910-11.

## II

The Defendant also argues for the equitable remedy of contract reformation on the theory that Plaintiffs' fraudulently altered the contract (DN 21, 9-11). However, based on the undisputed facts we see no fraud. Thus, reformation is not warranted.

Reformation is authorized "when, because of fraud or mutual mistake, the writing does not reflect the intentions and understandings of the party seeking relief." *Cartwright v. Mfr. & Traders Trust Co.*, No. 2006-CA-002307-MR, 2008 WL 5264277, at *3 (Ky. Ct. App. Sept. 23, 2009); *see also Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1108 (Ky. Ct. App. 1931). The goal of reformation is to respond to genuine instances of fraud or mistake without undermining the expectation that the plain meaning of contract terms will be enforced. *Id*. To strike the balance between remedying fraud and maintaining the contracting parties' expectations, Kentucky courts insist that the contracting parties exercise "at least the degree of diligence which may be fairly expected from a reasonable person." *Id*. Under *Cartwright,* the defendant must present clear and convincing evidence of mutual mistake, and evidence that "they acted with the diligence of a reasonable person." *Id*.

The Defendant alleges: (1) that Plaintiffs deceptively made changes to Defendant's tariff provision in their counter-offer on a supplemental part of the document instead of the body; (2) that Plaintiffs neither handwrote nor initialed their changes; and (3) that Plaintiffs failed to inform the Defendant of the changes when they signed and returned the contract several weeks after the Defendant emailed its offer (DNs 42-5, 11 and 47).

However, as discussed above, the changes in the Plaintiffs' counter-offer (1) were clear and obvious; (2) were neither secretly located nor concealed in small typeface; (3) were mailed along with a letter requesting countersignature; and (4) further, Plaintiffs sent their counter-offer directly to the Defendant's legal department (DN 45).

The court is not moved by the Defendant's contentions that Plaintiffs' fraudulently amended the offer which the Defendant had already signed (DN 42-5, 11). Here, there is no evidence of fraud or mutual mistake. Therefore, the court is not persuaded to intervene and reform the contract.

The Defendant also requests reformation based on the Plaintiffs' alleged misrepresentation (*see* DN 42-5, 9-11). The RESTATEMENT (SECOND) OF CONTRACTS: WHEN A MISREPRESENTATION PREVENTS FORMATION OF A CONTRACT § 163 (1981) states:

> If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent.

Accordingly, the Defendant's manifestation of assent would only trigger the misrepresentation rule if the Defendant neither knew nor had a "reasonable opportunity to know of the character or essential terms" of Plaintiffs' counter-offer. *See id*. Here, the Defendant's misrepresentation argument fails because, as the court already discussed, the Defendant had

reason to know Plaintiffs' counter-offer would exclude the Defendant's tariff.[2]

### III

Plaintiffs' argue that the BOL that accompanied the Defendant's deliveries establish Defendant's liability for consequential damages. Plaintiffs contend that for each of Defendant's deliveries that later warranted a claim for loss, damage, or noncompliant delivery, the parties also executed a BOL (DN 45, 9). Under Kentucky law, a carrier is liable to the party entitled to recover under the bill of lading for any actual loss or injury to the property unless the carrier limits its liability under a tariff pursuant to the Interstate Commerce Act. *Toledo Ticket Co. v. Roadway Express, Inc.*, 133 F.3d 439, 441 (Ky. Ct. App. 1998); *see* 49 U.S.C.A. § 14706.

Here, the BOL (DN 45-13) stated:

> The [Defendant] Carrier shall be liable for interest on any claims not paid within 30 days and for attorneys' fees and disbursements in connection with the collection thereof, and for consequential damages resulting from failure of delivery as herein specified. The delivery dates herein specified shall be deemed of the essence and the carrier shall be liable for consequential damages to the Shipper [Plaintiff] or consignee for late delivery, including but not limited to fines by any customer levied upon the Shipper for delay or failure of delivery.

> It is the responsibility of the Carrier to maintain shipment integrity. Customer of Shipper is to receive all items in shipment on the same day at the same time or Carrier will be responsible for any actual or consequential damages.

The BOL reinforces Plaintiffs' intent to hold the Defendant liable for "consequential damages resulting from failure of delivery" and "consequential damages to the shipper or consignee for

---

[2] The court will not readdress the Defendant's argument that Plaintiffs' fraudulent modifications rendered the counter-offer voidable, as this argument fails. "If a party's manifestation of assent is induced by either a fraudulent or material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable." RESTATEMENT (SECOND) OF CONTRACTS: WHEN A MISREPRESENTATION MAKES A CONTRACT VOIDABLE § 164 (1981). Here, for a misrepresentation to make the counter-offer voidable (1) the Plaintiffs must have made a fraudulent or material misrepresentation, and (2) the Defendant must have been justified in relying on it. The court will not readdress fraud, misrepresentation, or Defendant's reasonableness in relying on Plaintiffs' alleged misrepresentation..

late delivery." (DN 45-13) The Defendant neither addressed Plaintiffs' argument that the BOL established the Defendant's liability nor cited any law to the contrary (DNs 42-5 and 47).

Although Plaintiffs do not allege that a BOL accompanied each delivery, they contend that "most if not all of the deliveries at issue" used the BOL provided by Plaintiffs (DN 45, 9). The BOL liability provision may control at least some of the disputed claims, thus summary judgment in favor of the Defendant is not appropriate.

## IV

The Defendant argues that the doctrine of unclean hands bars Plaintiffs' recovery (DN 42). Under Kentucky Law, the unclean hands doctrine "is a rule of equity that forecloses relief to a party who has engaged in fraudulent, illegal, or unconscionable conduct." *Suter v. Mazyck*, 226 S.W.3d 837, 843 (Ky. Ct. App. 2007). Although the doctrine is broad in application it "will not apply to all misconduct or to 'every act smacking of deceit' in relation to the matter in which relief is sought." *Id*. (*quoting Parriss' Adm'r v. John W. Manning & Sons*, 144 S.W.2d 490, 492 (Ky. 1940)). Also, the transaction in which there was misconduct must be connected to the matter in litigation. *Id*. (*quoting Eline Realty Co. v. Foreman*, 252 S.W.2d 15, 19 (Ky. 1952)).

The Defendant alleges that the unclean hands doctrine applies because Plaintiffs engaged in fraudulent conduct by amending the contract without advising the Defendant of the alterations (DN 42-5, 12). Under the analysis made earlier, we view the Plaintiffs' contract as a counter-offer. Additionally, the Defendant does not allege that Plaintiffs' actions were either illegal or unconscionable to satisfy the unclean hands doctrine. There is no evidence that Plaintiffs' fraudulently submitted their counter-offer. Therefore, the Defendant's argument fails. *See Suter* 226 S.W.3d at 843.

Therefore, motion having been made and for the reasons set forth herein and the court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that the motion of the Defendant, Averitt Express, Inc. for summary judgment (DN 42) is **DENIED.**

**IT IS SO ORDERED.**

November 9, 2012

                                    **Charles R. Simpson III, Judge**
                                    **United States District Court**